## KANSAS CITY SOAP CO. v. ILLINOIS CUDAHY PACKING CO. *

(Circuit Court of Appeals, Eighth Circuit. March 27, 1920.)

No. 5173.

1. Corporations ⚙⚖577—May enforce contract after transfer of property to reorganized company.

A corporation which, after. making a contract for the purchase of merchandise on a term of credit, pursuant to a plan of reorganization, conveyed all of its property to the new corporation, subject to all its debts, undertakings, liabilities, and obligations, which were assumed by the new company, did not thereby, without the consent of the other party, become released from the obligation of its contract, nor divest itself of the right to enforce the same, and may maintain an action for its breach. (Elliott, District Judge, dissenting.)

2. Corporations ⚙⚖577—Transfer of all property by corporation not breach of executory contract.

That plaintiff corporation, after making a contract with defendant for the purchase of merchandise on credit, pursuant to a plan of reorganization, conveyed all of its property to a new corporation, subject to all its debts, undertakings, liabilities, and obligations, which were assumed by the new company, held not to have deprived it of the right to enforce performance of the contract or to recover damages for its breach, especially where it tendered to defendant the contract price. (Stone, Circuit Judge, dissenting.)

3. Appeal and error ⚙⚖997(3)—Directed verdict, when asked by both parties, reviewable only for want of any evidence.

Where both parties move for directed verdict, neither can assail the finding made on any other ground than that there was no substantial evidence to sustain it.

In Error to the District Court of the United States for the District of Kansas; John C. Pollock, Judge.

Action by the Illinois Cudahy Packing Company against the Kansas City Soap Company. Judgment for plaintiff (247 Fed. 556), and defendant brings error. Affirmed.

Eldridge H. Henning, of Kansas City, Mo. (J. H. Brady, of Kansas City, Kan., on the brief), for plaintiff in error.

Don Kenneth Jones, of Chicago, Ill. (George T. Buckingham, of Chicago, Ill., and O. Q. Claflin, of Kansas City, Kan., on the brief), for defendant in error.

Before SANBORN and STONE, Circuit Judges, and ELLIOTT, District Judge.

---

⚙⚖For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
*Rehearing denied August 7, 1920.

SANBORN, Circuit Judge. On September 30, 1915, the Kansas City Soap Company, a corporation of the state of Kansas and the defendant below, made a contract with the Illinois Cudahy Packing Company, the plaintiff, to sell and deliver to the latter for prices specified therein, on a credit of 30 days from the respective dates of the invoices, 90 drums of glycerine. The defendant delivered, and the plaintiff paid for, 54 drums. Then the defendant refused to deliver the remaining 36 drums because, pursuant to a scheme of reorganization of the plaintiff, whereby those entitled to stock in that corporation took, for their stock, stock in the Cudahy Packing Company of the State of Maine, a new corporation, and the plaintiff made a written assignment of all its personal property and a conveyance of all its real estate, which together were worth about $38,000,-000, to the Maine corporation—

"subject to all the debts, undertakings, liabilities, and obligations whatsoever of grantor, heretofore existing and to exist on October 31, A. D. 1915, which said debts undertakings, liabilities, and obligations of grantor grantee hereby assumes and agrees to discharge, pay, carry out, and in all things perform."

The plaintiff never notified the defendant of this assignment or conveyance, never ordered or requested it to deliver the 36 drums to the Maine corporation, never refused to perform its part of its contract with the defendant, and after October, 1915, it continued to do business about the liquidation of its obligations and the performance of its contracts entered into prior to that date personal to it, so far as this was necessary for the discharge of its duties and obligations. On March 8, 1917, it made a legal tender to the defendant of the contract price of the 36 drums of glycerine and demanded their delivery. The defendant refused to deliver any of them. The plaintiff thereupon brought this action for the damages which it sustained by the defendant's breach of contract. At the trial the parties stipulated the amount of the damages, if any, and each party moved the court for a directed verdict in its favor, and the court thereupon directed a verdict and rendered a judgment for the plaintiff for $7,172.94 and interest from March 16, 1917.

Two questions, and two only, are presented to this court for decision. They are: Did the general assignment of its property to the Maine corporation by the plaintiff divest the latter of its interest in its contract with the soap company, so that it is not the real party in interest in this action against the defendant for its refusal to perform its contract? And, if the plaintiff is the real party in interest in this action to recover the damages caused by the defendant's failure to perform its contract, did the plaintiff lose its right to recover these damages because it made an assignment of all its property to the Maine corporation subject to all its debts, liabilities, and obligations, which the Maine company assumed, in view of the facts that the plaintiff did not notify the defendant of its assignment or order or request it to deliver any of the glycerine to the Maine company, that it never refused to perform its part of the contract, that after October, 1915, it continued to do business relative to the performance of its contracts and the liquidation of its obligations and that it tendered full pay-

ment of the purchase price of the 36 drums of glycerine to the defendant and demanded their delivery to it pursuant to the contract of sale? The court below answered the first question in the affirmative, and the second in the negative, and rendered a judgment for the plaintiff.

[1] This is an action at law, and the judgment below may not be lawfully reversed, unless the court below was in error in its answer to at least one of these questions. The majority of the court have reached the conclusion, from which Judge ELLIOTT dissents, that the answer of the court below to the first question was correct, and that the plaintiff is the real party in interest in this action. These are some of the considerations which have led the majority of the court to this result: This was an executory contract for the sale of personal property on credit, which was partially performed when the plaintiff made its assignment and conveyance to the Maine company. Without the consent of the defendant, and it never consented, it was beyond the power of the plaintiff, and beyond the power of the plaintiff and the Maine company together, under the law, to substitute the Maine company for the plaintiff in the contract with the defendant as the purchaser and deliveree of the glycerine, or to vest in that company any right or interest in the contract or in its performance. · National Bank v. Hall, 101 U. S. 43, 50, 25 L. Ed. 822; Equitable Life Assurance Society v. McElroy et al., 83 Fed. 631, 641, 28 C. C. A. 365, 375.

While the consent of the defendant would have effected an assignment of the interest of the plaintiff, and vested the right to the performance of the contract in the Maine company, the written assignment of it was void, and the contract was unassignable under the law without it. Without such an assent of the other contracting party, the paper assignor of such a contract remains liable to the former for the performance of his covenants therein. Illinois Car & Equipment Co. v. Linstroth Wagon Co., 112 Fed. 737, 741, 50 C. C. A. 504, 508; Lovell v. St. Louis Mutual Life Ins. Co., 111 U. S. 264, 274, 275, 4 Sup. Ct. 390, 28 L. Ed. 423. Without such assent of the other contracting party, the paper assignee of such a contract has no interest in it, and cannot maintain an action for a breach of it. Arkansas Valley Smelting Co. v. Belden Mining Co., 127 U. S. 379, 380, 381, 387, 388, 8 Sup. Ct. 1308, 32 L. Ed. 246; Boston Ice Co. v. Potter, 123 Mass. 28, 30, 31, 25 Am. Rep. 9, where the defendant contracted with the Citizens' Ice Company to furnish him with ice. During the delivery of the ice under the contract the Citizens' Company sold out to the Boston Ice Company, which continued the delivery until the defendant discovered that the Boston Ice Company was delivering the ice to him, when he refused to pay for that which had been delivered by it. The Boston Company sued him for the price of the ice it had delivered pursuant to the contract. The court held that he was not liable to the Boston Ice Company, because it had never become a party to the contract with him. Lansden et al. v. McCarthy, 45 Mo. 106, 107; Joseph Dixon Crucible Co. v. Paul, 167 Fed. 784, 787, 788, 93 C. C. A. 204, 205, 208; Nation-

al Bank v. Hall, 101 U. S. 43, 50, 25 L. Ed. 822; Hardy Implement Co. v. South Bend Iron Works, 129 Mo. 222, 228, 229, 31 S. W. 599; Watterson v. Webb, 4 La. Ann. 174.

And without such an assent of the other contracting party an assignor, in such a paper assignment of an unassignable contract, claim or title, does not lose his right in or title to the contract by his futile attempt to assign it, but retains his right and title to it, and is the real party in interest in an action to enforce it or to recover damages for a breach of it. Galbraith v. Payne, 12 N. D. 164, 172, 96 N. W. 258, and cases there cited; McLeland v. St. Louis Transit Co., 105 Mo. App. 473, 80 S. W. 30, 31; New Orleans Gaslight Co. v. Webb, 7 La. Ann. 164. As the majority of this court are of the opinion that the trial court committed no error in its answer to the first question, the judgment below may not be reversed on account of that ruling.

[2] Did the real party in interest in this action, and in the contract on which it is based, the plaintiff, lose its right to recover the actual damages which it sustained by the defendant's breach of the agreement, because it made the assignment and conveyance of its property, subject to its debts and liabilities, to the Maine company, which assumed and agreed to pay them, in view of the facts that it tendered full payment of the contract price for the glycerine, never failed or refused to perform its part of that contract, never notified the defendant of the assignment or conveyance, and never requested it to deliver the glycerine to the Maine company, or to accept that company in its place as the purchaser in the contract? The court below answered this question in the negative, and the majority of this court are of the opinion that its answer was right, a conclusion from which Judge STONE dissents.

The ground on which counsel for the defendant base their conclusion that this question should have been answered in the affirmative is, as stated in their answer, that by the assignment and conveyance of its assets in October, 1915, the plaintiff stripped itself of all property whatsoever, so that the—

"plaintiff from and since the said 14th day of October, 1915, has not been solvent or a going concern, and at no time since the said 14th day of October, 1915, has plaintiff been able to accept deliveries under the said contract or to pay for the same."

Conceding that if, after the assignment of October, 1915, the plaintiff had been without means and ability to pay for the 36 drums of glycerine still due from the defendant according to the terms of the contract, the latter might have been released from its liability to deliver them, the majority of the court are of the opinion that the defendant was not released for these reasons:

Whether or not the plaintiff was so stripped of its property by the assignment and conveyance that it was insolvent, and could not accept and pay for the 36 drums of glycerine, after October, 1915, was a question of fact, determinable by the stipulations and admissions of the defendant and the evidence in the record. That

evidence is, as has already been shown, that without the consent of the defendant, which never was given, the right to the receipt and delivery of these 36 drums of glycerine at the contract price was not and could not be assigned or transferred to the Maine company, and that this right remained in the plaintiff notwithstanding the assignment and conveyance. The evidence and the admission of the defendant establish the fact that, owing to the advance in the market value of glycerine, this right to these 36 drums of glycerine was worth $7,172.94 more than their contract price. The contract required the defendant to deliver them to the plaintiff on a credit of 30 days. If it had so delivered them at any time after October, 1915, the plaintiff could have sold them within the 30 days for a much larger sum than the contract price, and with the proceeds could have paid, and the legal presumption is that it would have paid, to the defendant the contract price for them. Again, the evidence and the admissions of the defendant established the fact that, even without the delivery of this glycerine to the plaintiff 30 days before payment for it, to which it was entitled, the plaintiff not only had the ability to pay for it, but it actually had in legal tender and offered to pay to the defendant the full purchase price of these 36 drums, and the defendant refused to accept it. The legal presumption is that this money was the plaintiff's, and there is no evidence to the contrary.

Moreover, under the express terms of the assignment to the Maine company, that company took, accepted, and held in trust the $38,-000,000 of property, subject to all the liabilities and obligations of the plaintiff, and hence subject, among other liabilities, to the plaintiff's liability under the contract with the defendant, so that under the assignment, and under familiar rules and principles of law, that $38,000,000 of property at the instance of the plaintiff, or, at the instance of the defendant upon delivery of the glycerine, was applicable to the payment of the purchase price therefor. In view of the evidence and the admissions of the defendant, to which reference has now been made, it is believed, not only that the defendant failed to establish its claim that the plaintiff was insolvent and that it was without ability to pay for these 36 drums of glycerine after October, 1915, but also that the contrary was clearly proved at the trial of this case.

[3] Not only this, but at the close of the trial each party requested the trial court to instruct the jury to return a verdict in its favor, and the court directed a verdict in favor of the plaintiff. That verdict could not have been directed by the court without its having first considered and found that the plaintiff had not so stripped itself of its property that it was insolvent and unable to pay for the 36 drums of glycerine subsequent to October, 1915, and the memorandum of the trial court in the transcript in the case shows that this was its conclusion. The defendant, by its request for an instructed verdict in its favor, was estopped from assailing that finding upon any other ground than that there was no substantial evidence to sustain it (United States v. Bishop, 125 Fed. 181, 183, 60 C. C. A. 123, 125; Phenix

Ins. Co. v. Kerr, 129 Fed. 723, 724, 64 C. C. A. 251, 252), and the evidence and admissions recited above have convinced that there was such evidence in support of that finding.

As the majority of this court are of the opinion that there was no error in the answer of the court below to the second question, there may not lawfully be a reversal of the judgment on account of that ruling, and the judgment below must be affirmed. It is so ordered.

STONE, Circuit Judge (dissenting). As stated by Judge SANBORN, I cannot agree with the majority upon the second question discussed. This question belongs in the law of contracts, and is whether the Cudahy Company has given sufficient legal grounds to discharge the Soap Company from further performance of the contract. If the Cudahy Company has committed such a breach of the contract as will materially affect its further performance of its obligations under the contract, the Soap Company may terminate its own future obligations thereunder. Concerning breaches of contract, Elliott, in his recent work on Contracts (section 2025) says:

"The breach may occur in any one of three ways: The party may renounce his liability under the contract, or he may by his own act make it impossible for him to fulfill his liabilities under the contract, or he may totally or partally fail to perform his promise."

We are here concerned with the two first of these methods. Concerning these he says, in the same section:

"The first two forms of breach may take place while the contract is still executory and before performance can legally be demanded. * * * The effect of a breach of a contract by one party is to excuse performance by the other, and generally, but not always, to discharge the contract."

It is here claimed that the Cudahy Company both renounced the contract and also voluntarily rendered itself incapable of further performance. Since both parties waived jury and requested peremptory findings, the court can examine only such facts as are undisputed, or proven beyond controversy, and draw therefrom only such inferences favorable to the Soap Company as necessarily follow. However, we are not bound by any results or findings not supported by the evidence. Fortunately the essential facts are undisputed. They are: That during course of performance of a contract for sale to the Cudahy Company upon credit it deeded, assigned, and transferred all of its assets, real, personal, and mixed, including all "rights," its "good will, and going business," to another company; that such assets, etc., went, subject to all of the debts "undertakings, liabilities and obligations, whatsoever, of grantor, * * * which said debts, undertakings, liabilities, and obligations of grantor, grantee hereby assumes and agrees to discharge, pay, carry out, and in all things perform, and to save grantor forever harmless therefrom." All of the capital stock of the Cudahy Company was also transferred to the other company. The entire consideration for all of the above was shares of stock in the other company. No part of this stock was paid into the treasury of the Cudahy Company, but was issued and de-

livered to the former stockholders thereof, as their own property. I find no evidence of action by plaintiff since his transfer, except this one transaction here involved. When the transaction was completed the situation was that the Cudahy Company, which had been a large and prosperous going concern with something like $38,000,000 of varied assets, had absolutely nothing, had ceased active business, with its complete control, represented by all of its capital stock, in the hands of the purchasing company. All of this was the necessary result of its own voluntary acts.

Do such acts amount to a renunciation or disabling for further performance under the contract? That the Cudahy Company intended to transfer the benefit of this contract seems certain to me. That it also expected its grantee to assume performance of all its obligations thereunder, and to hold it harmless for any injury through failure to do so, seems plain. Whether it intended that a total assignment of the contract, rights, and obligations should be taken as an expression of its intention absolutely to cease further performance on its part does not necessarily follow from the sole circumstance of the assignment of the entire contract. A party to a contract might assign it with the hope that the other contracting party would accept the assignee in his place, and yet have no intention of renouncing or escaping his obligations under the contract, if the other party refused to accept the assignee. At the same time, an assignment might be under such circumstances as to clearly evidence renunciation of the contract, or it might be one of a set of facts which as a whole show such renunciation. The circumstances under which this contract was assigned, or the set of facts of which this assignment was one, are that this contract was part of a large transaction which was intended to, and did, have the effect of transferring the entire business and assets of the Cudahy Company leaving it penniless and in complete control of the transferee. It was left an empty corporate shell, incapable of action of any sort, except as its assignee willed, with no power to, or property from which, to meet its obligations, including those under this contract, except as the assignee, or some volunteer, with the assignee's consent might come to its aid. Such a puny, helpless creature bears no resemblance to the powerful, rich company with which, and upon the credit of which, the Soap Company contracted and assumed obligations. This change had been voluntarily wrought by the Cudahy Company. In my judgment, an assignment of a contract, under circumstances totally impairing the assignee's ability to further perform, is conclusive proof that it had no intention of further performing.

But, aside from a theory of renunciation, there clearly is revealed a voluntary deprivation of all power to perform or pay. To my mind it is no answer to say that this was a question of fact on opposing evidence; there was no opposing evidence. It is said that the evidence establishes that the glycerine was worth much more than the contract price, and therefore the purchaser could resell it within the 30 days of credit, and out of the proceeds pay the seller. This was a credit transaction, and the credit upon which the sale was made, and

upon which the rule of law is founded, has no reference to the value of the goods delivered by the seller under such credit sale. No man relies for payment upon the value of the goods he is delivering in a sale. Such is no part of the basis of credit for the sale. What guaranty in law or fact has the seller that the buyer will respond for any portion of the higher price for which he (the buyer) may resell the glycerine, or even that he will resell it, or resell within the 30 days of credit? Or what assurance that the glycerine, or its proceeds, if resold, would not be seized upon by some creditor of the buyer, or consumed by the buyer itself? Commercial credits rest in no case upon such shadowy and shifting foundations.

Another position is that actual legal tender was made of the amount due, and that the legal presumption is that the money tendered belonged to plaintiff. I know of no such legal presumption; but, if there is such, the testimony, undisputed, shows beyond peradventure of doubt that such was not the fact here. This company had parted with every penny of its property, and it could not have had any money of its own to offer. It is crystal clear that the money offered was that of the assignee, who desired to take advantage of the contract, and in no sense that of the plaintiff. This bogus solvency, useful in taking hold of advantageous contracts, and nonexistent where the contract is otherwise, was condemned by Judge Thayer, formerly of this court, when he was on the Missouri state circuit, and that attitude affirmed on appeal. Boykin v. Campbell, 9 Mo. App. 495. It seems to me that, if this position and the preceding one are well taken, then a hopelessly insolvent buyer can always demand performance where it is advantageous to him to have performance, because he can always say to the seller, "The value of the goods you deliver is more than the contract price," or he can say, "I have, or I will have, by pay day, the amount due therefor." In my judgment this emasculates, if it does not effectively eliminate, the rule of law that voluntary inability to pay after execution of sales contract excuses delivery, following such inability. Another position is that the large assets of the plaintiff went to the assignee, under a contract expressly making such assets subject to the liabilities and obligations of the plaintiff. Without this provision, the law would have presumed and executed such a trust. But such a conveyance of total assets is a renunciation of the contract, and entitles the seller to treat it as such. In Lovell v. Insurance Co., 111 U. S. 264, 273, 274, 4 Sup. Ct. 390, 395 (28 L. Ed. 423), the court said:

"The assignment of all of its assets by the old company to the new one, upon the consideration of its obligations being assumed by the new company, is somewhat analogous to an assignment of property by a debtor for the benefit of his creditors, in which only those creditors who are preferred, or those who choose to come in and participate in the fund assigned, receive any benefit, whilst those who refuse to come in take no benefit, preferring to retain their claim against the debtor. * * * Our third conclusion is that, as the old company totally abandoned the performance of its contract with the complainant, by transferring all its assets and obligations to the new company, and as the contract is executory in its nature, the complainant had a right to consider it as determined by the act of the company, and to demand what was justly due to him in that exigency. Of this we think there can be no doubt.

Where one party to an executory contract prevents the performance of it, or puts it out of his own power to perform it, the other party may regard it as terminated and demand whatever damage he has sustained thereby."

Expressions on page 272 of this same case are closely applicable to the instant case. Central Trust Co. v. Chicago Auditorium, 240 U. S. 581, 36 Sup. Ct. 412, 60 L. Ed. 811, L. R. A. 1917B, 580, is also in point in its reasoning. On page 591 of 240 U. S., on page 415 of 36 Sup. Ct. (60 L. Ed. 811, L. R. A. 1917B, 580) the court says:

"Commercial credits are, to a large extent, based upon the reasonable expectation that pending contracts of acknowledged validity will be performed in due course; and the same principle that entitles the promisee to continued willingness entitles him to continued ability on the part of the promisor. In short, it must be deemed an implied term of every contract that the promisor will not permit himself, through insolvency or acts of bankruptcy, to be disabled from making performance; and, in this view, bankruptcy proceedings are but the natural and legal consequence of something done or omitted to be done by the bankrupt, in violation of his engagement."

Neither insolvency nor bankruptcy could more effectually disable to perform than to strip a company of its business and all of its assets, and place its complete control in the hands of its assignee, as was here done. The above decisions are controlling, and seem to me applicable to the situation here presented. Cases dealing with assignments of property, or rights therein, are not helpful here, because this is a pure question of what constitutes a renunciation or breach of a contract. The basis of those decisions is different, as set out in Galbraith v. Payne, 12 N. D. 164, at 171, 96 N. W. 258. I think this total assignment, which not only stripped this plaintiff of all of its assets, but distributed the proceeds therefrom among the stockholders, leaving this plaintiff a mere shell, with even its capital stock in control of its assignee, was, within the above United States Supreme Court decisions, a renunciation of the contract of purchase, and such a breach as entitled the seller to refuse further performance.

Therefore I conclude that the judgment should be reversed.